119 N.J. Super. 164 (1972)
290 A.2d 465
SOUTHERN BURLINGTON COUNTY NAACP ET ALS., PLAINTIFFS,
v.
TOWNSHIP OF MOUNT LAUREL ET ALS., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided May 1, 1972.
*165 Mr. Carl S. Bisgaier for plaintiffs (Mr. David H. Dugan, III, Director, Camden Regional Legal Services, Inc., attorney).
Mr. John F. Gerry for defendants (Messrs. Wallace, Douglas, Gerry & Mariano, attorneys).
*166 MARTINO, A.J.S.C.
Plaintiff's herein consist of corporate entities and certain individuals, resident and nonresident, who seek declaratory and injunctive relief against a municipality's zoning ordinance. The right of the corporate entities to bring the action raises a question of qualification to do so, but since certain individual plaintiffs are township residents their right to sue will permit the court to dispose of the issue raised without a determination of the right to sue raised against the other plaintiffs.
The factual situation as it appears as to the resident plaintiffs clearly indicates one of them has moved into a house which was originally used as a summer quarters for a summer camp. The electrical wiring is in an exposed condition and she often gets shocks from the outlets; one space heater by the front door provides inadequate intermittent heat and she must use the gas stove to provide sufficient heat; cold air comes through the windows; drains do not work on occasion and the cesspool backs up into the toilet. She was told that the county board of health and the local building inspector want to be advised when she leaves so that they can "post" the house as unfit for human habitation. She has two children, ages four and two, and receives $282 a month from the Welfare Department. In 1969 the planning board of defendant township recommended blighted area treatment for the area in which she lives.
Another resident with two children and two grandchildren, a widow, lives in an area also recommended for blighted area treatment by the planning board. The dwelling in which she lives was the subject of the first receivership action brought in this State under the new Receivership Law  N.J.S.A. 2A:42-85 et seq. For five years she and her family had been living in the house without any indoor plumbing or hot or cold running water. As a result of the court proceedings the house was put in receivership and repairs ordered. As a result her toilet is now functional and she has hot and cold running water. However, insufficient funds are available to repair a leaking roof, plaster continues *167 to fall, the stove is broken, pipes leak in bathroom, the house is infected with vermin. She has attempted to find other quarters in Mount Laurel, but is unable to do so because of her present income. Her total annual income is $6,000.
Another plaintiff has lived with her husband and seven children in defendant township for 20 years. The house is old and crowded and the area is surrounded by industrial uses. She was unable to give the age of the building, although she has lived in it 20 years.
Defendant township stipulated that three other persons who are party plaintiffs were former residents of Mount Laurel but were forced to move to adjoining municipalities. One couple had been living in a converted chicken coop; the cesspool kept backing up and the quarters were infected with vermin. This couple was forced to move in 1970. Another plaintiff was born in defendant township but was forced to move to Camden. The family had lived in a structure in Mount Laurel called "Diamond Apts." Their quarters were heated by a single kerosene heater; there was little or no hot water; the cesspool backed up and the place was infected with vermin. The family consisted of a husband and wife and four children. Another plaintiff, separated from her husband, was forced to move to Camden because the house she and her four children lived in while a resident of Mount Laurel had ceilings that were cracked and opened. A coal furnace with air vents on the first floor heated the entire house. Water lines continually became frozen; the cesspool kept filling up and backing up.
Testimony has indicated that in defendant municipality the minimum building costs of a single-family home is approximately $23,000. This would be the cost of the home completely bare, built on nonunion wages. Testimony further revealed that such a home built at union wage and including minimal amenities would cost 10% to 20% more. This would result in an expense for a single-family home that would not qualify for federal subsidized programs *168 within the reach of the resident plaintiffs herein neglected. Over the years defendant municipality has acted affirmatively to control development and to attract a selective type of growth. These plans were financed with state and federal funds. The township has consistently excluded trailers or mobile homes from its confines. Multi-family uses were generally prohibited as early as 1954 in the local ordinances and the amendments which followed.
While plaintiffs' testimony referred to clearly indicates the neglect of defendant municipality as to them, the suit by these individuals who appear of record is proposed as a class action for the benefit of many others who, it is alleged and not disputed, suffer from the same substandard type of housing accommodations and reside in defendant municipality.
Under certain factual circumstances our Supreme Court has upheld zoning ordinances which require minimum interior floor space, Lionshead Lake Inc. v. Wayne Tp., 10 N.J. 165 (1952), app. dism. 344 U.S. 919, 73 S.Ct. 386, 97 L.Ed. 708 (1953); which limit lot sizes for a single-family unit to five acres, Fischer v. Bedminster Tp., 11 N.J. 194 (1952); which absolutely prohibit the construction of any additional multi-family units, Fanale v. Hasbrouck Heights, 26 N.J. 320 (1958); which prohibit the use of mobile homes on an individual lot, Napierkowski v. Gloucester Tp., 29 N.J. 481 (1959), and which absolutely prohibit all mobile-home parks from a township, Vickers v. Gloucester Tp. Committee, 37 N.J. 232 (1962), cert. den. 371 U.S. 233, 83 S.Ct. 326, 9 L.Ed.2d 495 (1963).
Plaintiffs do not quarrel with the above-mentioned cases and, for the purpose of argument herein, are not suggesting that they be overruled. They maintain that, if anything, these cases clearly enumerate judicial standards which mandate that they prevail in the instant case. Following the Lionshead case, which will be discussed infra, our court in Pierro v. Baxendale, 20 N.J. 17 (1955), aptly noted:
*169 We are aware of the extensive academic discussion following the decisions in the Lionshead and Bedminster cases, supra, and the suggestion that the very broad principles which they embody may intensify dangers of economic segregation * * *. In the light of existing population and land conditions within our State these powers may fairly be exercised without in anywise endangering the needs or reasonable expectations of any segments of our people. If and when conditions change, alterations in zoning restrictions and pertinent legislative and judicial attitudes need not be long delayed [at 29; emphasis added]
In defendant township multi-family dwellings are only permitted on a farm for a farmer, a member of the farmer's family, or persons employed by the farmer, provided the multiple-family dwelling is not closer than 200 feet from the property boundary line.
Minutes of various township committee meetings expressing the attitudes of the members of the governing body were introduced into evidence. Early in 1968 the mayor, when a discussion arose as to low-income housing, stated it was the intention of the township committee to take care of the people of Mount Laurel Township but not make any area of Mount Laurel a home for the county. A committeeman added that it was the intent of the township to clear out substandard housing in the area and thereby get better citizens. At a later meeting of the township committee in 1969 a variance to permit multi-family dwelling units was rejected because the committee did not see a need for such construction. At a meeting in 1970 a committeeman, during a discussion of homes being run down and worthless, indicated that the policy was to wait until these homes were vacant before the township took action, "because if these people are put out on the streets they do not have another place to go." At another meeting in September 1970 a township committeeman, when referring to pressure from the Federal and State Governments to encourage low-cost housing, retorted that their most useful function was to evaluate and screen away all but the most beneficial plans. He added, "We must be selective as possible  approving *170 only those applications which are sound in all respects  We can approve only those development plans which will provide direct and substantial benefits to our taxpayers." (Emphasis added) All through the various admissions permitted to be introduced into evidence, the evidence clearly indicates the attitude of developers who proposed various developments which were not concerned with people of low incomes. Every proposal made leaned in the direction of homes for only those of high income.
A research specialist and planning attorney, who was a consultant to the Division of State and Regional Planning, Department of Community Affairs, and a reporter to the State Land Use Revision Commission charged with revising the State's enabling legislation regarding planning and zoning in New Jersey, as well as counsel to Governor Cahill's Housing Task Force Committee, called by defendant municipality as one of its experts, categorically stated that the lack of permissible multi-family provisions in the zoning ordinance was a very good indication that low-income families were not being provided for. While he indicated that Burlington County, as a part of the Camden region, had a possibility of 45,000 multiple-family units under existing ordinances, it must be conceded that under our present enabling statute each municipality now controls its own zoning destiny.
Another expert witness employed by defendant municipality indicated that 66% of the township is vacant land. In the R-1 zone, which is the district having the lowest zoning category, viz., 9,375 square feet, there is currently 928 acres of vacant land available for development. This witness, a planner for defendant township for the past 2 1/2 years, conceded that nothing to his knowledge has been done to re-house the residents living in substandard dwellings in that community. He also conceded that he knew of no standard housing in defendant township available for residents on welfare; that people are living in substandard housing because the municipality will not condemn, inasmuch *171 as our Relocation Law, N.J.S.A. 20:4-1 to 22, would require that these residents be otherwise located.
The effect of this practice would account for the photographic exhibits, which indicate the deplorable facilities now tenanted by residents of the township.
In James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), involving a California constitutional provision which required that all public housing proposals be submitted to a referendum, the court upheld the right to referendum. However, the reason was that the referendum itself did not on its face socially discriminate. In Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), the same court invalidated a city charter which required all fair housing ordinances to be submitted to a referendum.
"The States, of course, are prohibited by the Equal Protection Clause from discriminating between `rich' and `poor' as such in the formulation and application of their laws." Douglas v. California, 372 U.S. 353, 361, 83 S.Ct. 814, 818, 819, 9 L.Ed.2d 811 (1963), cited by Justice Marshall, with Justice Brennan and Justice Blackmun concurring, in the dissent in James v. Valtierra, supra. Significantly, the dissent added that "It is far too late in the day to contend that the Fourteenth Amendment prohibits only racial discrimination; and to me, singling out the poor to bear a burden not placed on any other class of citizens tramples the values that the Fourteenth Amendment was designed to protect."
Very little weight should be placed on the majority opinion in James v. Valtierra, supra, as an argument on behalf of defendant municipality, because the court there said, "Furthermore, an examination of California law reveals that persons advocating low-income housing have not been singled out for mandatory referendums while no other group must face that obstacle."
In Southern Alameda Spanish Speaking Organization v. City of Union, 424 F.2d 291 (9 Cir.1970), the court, *172 while only passing on the right to referendum as in James v. Valtierra, supra, significantly stated:
Surely, if the environmental benefits of land use planning are to be enjoyed by a city and the quality of life of its residents is accordingly to be improved, the poor cannot be excluded from enjoyment of the benefits. Given the recognized importance of equal opportunities in housing, it may well be, as matter of law, that it is the responsibility of a city and its planning officials to see that the city's plan as initiated or as it develops accommodates the needs of its low-income families, who usually  if not always  are members of minority groups. [at 295-296]
In Hobson v. Hansen, 269 F. Supp. 401 (D.C. 1967) aff'd sub nom. Smuck v. Hobson, 132 U.S. App. D.C. 372, 408 F.2d 175 (1969) (en banc), the trial court stated:
The complaint that analytically no violation of equal protection vests unless the inequalities stem from a deliberately discriminatory plan is simply false. Whatever the law was once, it is a testament to our maturing concept of equality that, with the help of Supreme Court decisions in the last decade, we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous to private rights and the public interest as the perversity of a willful scheme. [at 497]
One of the earlier cases which appeared to follow the philosophy propounded by these plaintiffs was Brookdale Homes, Inc. v. Johnson, 123 N.J.L. 602 (Sup. Ct. 1940), aff'd 126 N.J.L. 516 (E. & A. 1941). In that case an ordinance required a dwelling to be not less than 26 feet above the building foundation. The court held:
* * * [A]n ordinance under the zoning act must bear a reasonable relation to the powers conferred by that act. * * * Restrictions imposed pursuant to the zoning act must tend at least in some degree to promote the public good; they must bear a "substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense.
It appears that plaintiff there sought the right to build a dwelling which would be only 21 feet high from its foundation. *173 The Court of Errors and Appeals filed a dissenting opinion joined in by six jurists.
Twelve years later Lionshead Lake, Inc. v. Wayne Tp., supra, was decided. That case has been the subject of much academic discussion. "Wayne Township: Zoning for Whom  In Brief Reply," 67 Harv. L. Rev. 986 (1954); Harr, "Zoning for Minimum Standards, The Wayne Township Case," 66 Harv. L. Rev. 1051 (1953). Chief Justice Vanderbilt concluded that constitutional and statutory changes in the meantime had in effect adopted the reasoning of the dissenters in Brookdale, supra, and rendered inapplicable the majority decision of the Court of Errors and Appeals which had held invalid an ordinance imposing minimum restrictions on the size of dwellings to protect the character of a community and property values therein. However, the opinion did include the statement:
We must bear in mind, finally, that a zoning ordinance is not like the law of the Medes and Persians; variances may be permitted, the zoning ordinance may be amended, and if the ordinance proves unreasonable in operation it may be set aside at any time. [10 N.J. at 172, 173; emphasis added]
A dissenting opinion by the late Justice Oliphant, who was joined by the late Justice Wachenfeld, commented upon the very points raised by plaintiffs in the instant case, i.e.,
Certain well-behaved families will be barred from these communities, not because of any acts they do or conditions they create, but simply because the income of the family will not permit them to build a house at the cost testified to in this case. They will be relegated to living in the large cities or in multiple-family dwellings even though it be against what they consider the welfare of their immediate families. [at 182]
Nineteen years later University of Toledo Law Review, vol. I, No. 1 (Winter 1969), at 76, had occasion to state, "Justice Oliphant's dissent in Lionshead is eloquent testimony to his farsightedness."
Today there remains only one jurist on our Supreme Court who concurred wth the majority in Lionshead, supra.
*174 [I]n zoning there must be a rational relation between the regulation and the promotion of the general welfare within the reach of the statutorily prescribed areas of action, and that the means invoked be in keeping with the public need. Arbitrary deviation from the general rule is forbidden; and, by the same token, undue discrimination in treatment and classification vitiates the regulation. [Roselle v. Wright, 21 N.J. 400, 410 (1956).]
The thin dividing line between economic segregation and racial or ethnic segregation can be seen in two New Jersey cases. It is generally assumed that it would be unconstitutional for the government by enactment and administration of local zoning ordinances to segregate residential areas by income levels, for example, by restricting an area to those families with incomes over $10,000. or to homes costing $20,000. In Stein v. Long Branch (2 N.J. Misc. 121 (Sup. Ct. 1924)) and Brookdale Homes, Inc. v. Johnson, (supra), (overruled in Lionshead, supra), the zoning ordinances provided that no residences should cost less than a certain amount. The provisions of these ordinances clearly intended to exclude those unable to afford the houses in question. [University of Toledo Law Review, supra, at 75]
Ten years ago Justice Hall, in his dissent in Vickers v. Gloucester Tp. Committee, supra, in a lengthy dissent which deserves close study, summed up the true function of zoning when he said:
In my opinion legitimate use of the zoning power by such municipalities does not encompass the right to erect barricades on their boundaries through exclusion or too tight restriction of uses where the real purpose is to prevent feared disruption with a so-called chosen way of life. Nor does it encompass provisions designed to let in as new residents only certain kinds of people, or those who can afford to leave in favored kinds of housing, or to keep down tax bills of present property owners. When one of the above is the true situation deeper considerations intrinsic in a free society gain the ascendancy and courts must not be hesitant to strike down purely selfish and undemocratic enactments. [37 N.J. at 264, 265; emphasis added]
While a municipality can be said to permit a use not specifically permitted in a zoned area by way of a variance, the Governor's message delivered March 27, 1972 clearly enunciated the long and tortuous delays in accomplishing any variant to the provisions of our present zoning ordinances, much to the frustration of and damage to the builder *175 and ultimate owner. See "New Horizons in Housing," A Special Message by William T. Cahill, Governor of New Jersey. The message, ever mindful of the rights of the individual to live, and let live, calls for a rejuvenation of the general welfare concept originally contemplated in zoning and planning. The message and the proposals it suggests may put to rest the problem that exists as to the poor and needy in the sphere of housing. The courts, however, must be ever watchful of any discriminatory acts of local units of government against the rights and privileges of the poor and underprivileged.
It must be conceded that there is a general principle against judicial inquiry into the exercise by a legislative body of its police powers. Courts have always had the power to scrutinize the issue of discrimination. The pleadings, the evidence and the issues framed in this action evoke judicial review beyond that posed by a generalized exercise of police power. The inquiry here was not limited to the terms of the ordinance; the court received evidence of the ordinance's purpose, its ultimate objective and all the circumstances attending its adoption and enforcement.
The problems which zoning has raised were nurtured by the decision of our United States Supreme Court in Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Those who oppose multi-family dwelling units find solace in the words of the late Justice Sutherland, who described multiple-family dwellings as very often a mere parasite whose presence utterly destroys the residential character of the neighborhood and its desirability as a place of residence. While the Euclid decision may have in effect condoned legislative zoning discretion, it did warn that:
It is not meant by this, however, to exclude the possibility of cases where the general public interest would so far outweigh the interest of the municipality that the municipality would not be allowed to stand in the way. [272 U.S. at 390, 47 S.Ct. at 119, 71 L.Ed. at 311]
*176 The Euclid case in the lower court plainly indicated the exclusionary use of zoning that was being perpetrated. That court said:
The plain truth is that the true object of the ordinance in question is to place all property * * * in a strait-jacket. The purpose to be accomplished is really to regulate the mode of living of persons who may hereafter inhabit it. In the last analysis, the result to be accomplished is to classify the population and segregate them according to their income or situation in life. [297 F. 307, 316 (N.D. Ohio 1924), rev'd 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926)]
Today, when municipalities give reasons for the exclusion of certain uses, although they gloss them with high-meaning phrases, they lack sincerity. It is not low-cost housing which ferments crime; it is the lower economic strata of society which moves in, yet no ordinance would dare to raise that objection to prohibit them and expect to succeed. Local legislative bodies know better than to state that more low-income producing structures will mean a higher tax rate. This is what the courts have abhorred as fiscal zoning. What local governing body would raise an objection to bringing a factory into a neighborhood because it would increase the population of the economically poor? While it may be an argument that it would affect property values, and while it is proper to zone in certain instances against factories, it is improper to build a wall against the poor-income people. In Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), the court made it clear that the Constitution nullifies sophisticated as well as simple-minded modes of discrimination.
In Duffcon Concrete Products v. Cresskill, 1 N.J. 509, 513 (1949), the court gave some promise when it said:
What may be the most appropriate use of any particular property depends not only on all the conditions, physical, economic and social, prevailing within the municipality and its needs, present and reasonably prospective, but also on the nature of the entire region in which the municipality is located and the use to which the land in that region has been or may be put most advantageously. The effective *177 development of a region should not and cannot be made to depend upon the adventitious location of municipal boundaries, often prescribed decades or even centuries ago, and based in many instances on considerations of geography, of commerce, or of politics that are no longer significant with respect to zoning. [at 513]
The judiciary cannot be expected to alleviate a condition that definitely calls for legislative action from either the national or state governments. The courts can only meet each specific situation as it is presented, and while one community may have facts which justify court intervention, the relief will not necessarily be the same in all areas unless the factual content justifies intervention, as this court believes in the case at hand. The Federal Government has left zoning problems to the states, and the states have largely, but not entirely, left them to the local governments. Housing, to be adequate for the poor, must be left primarily in the hands of a governmental body other than a local unit. The judiciary can only expect to give relief on a piecemeal basis, and "legislation" by the courts is often less than satisfactory.
Ever mindful of the admonitions set forth in the Constitutional mandate of the New Jersey Constitution, Art. IV, § VII, par. 11, enjoining liberal construction of provisions in that document and of laws concerning local government, I would parrot the words of Justice Hall in his dissent in Vickers, supra, 37 N.J. at 257, when he said, "Analysis demonstrates that the mandate has no true application in this situation."
There has been too much conservatism in the definition of the words which refer to one of the purposes of zoning, i.e. "to promote the general welfare." Some definitions would better apply to private welfare.
Our present State Supreme Court, in a different setting, said:
We specifically hold, as matter of law in the light of public policy and the law of the land, that public or, as here, semi-public housing accommodations to provide safe, sanitary and decent housing, to relieve and replace substandard living conditions or to furnish housing *178 for minority or underprivileged segments of the population outside of ghetto areas is a special reason adequate to meet that requirement of N.J.S.A. 40:55-39(d) and to ground a use variance. [DeSimone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428, 442 (1970)]
The patterns and practice clearly indicate that defendant municipality through its zoning ordinances has exhibited economic discrimination in that the poor have been deprived of adequate housing and the opportunity to secure the construction of subsidized housing, and has used federal, state, county and local finances and resources solely for the betterment of middle and upper-income persons. The zoning ordinance is, therefore, declared invalid.
Plaintiffs, in seeking declaratory and injunctive relief, argue that even if the zoning ordinance were declared invalid, the injury they suffer will not afford a remedy. They argue there is a desperate need for affirmative municipal action within parameters established by the court.
In Hawkins v. Shaw, 437 F.2d 1286, 1293 (5 Cir.1971), the court declared that a municipality cannot discriminate in the use of municipal services and said that a town could be required to submit a plan for the equitable distribution of such services. See also, Crow v. Brown, 332 F. Supp. 382 (N.D. Ga. 1971), aff'd 457 F.2d 788 (5 Cir. 1972).
This court agrees with plaintiffs and, therefore, orders that defendant municipality shall, upon the entry of a judgment to conform with these findings and conclusions of law, immediately undertake a study to identify:
a. The existing sub-standard dwelling units in the township and the number of individuals and families, by income and size, who would be displaced by an effective code-enforcement program;
b. The housing needs for persons of low and moderate income:
1. Residing in the township;
2. Presently employed by the municipality or in commercial and industrial uses in the township;
3. Expected or projected to be employed by the municipality or in commercial and industrial uses, the development of which can reasonably be anticipated in the township.
*179 Defendant shall, upon completion of the investigation referred to in the preceding paragraph, establish, to the extent possible, an estimated number of both low and moderate income units which should be constructed in the township each year to provide for the needs as identified in the preceding paragraph.
Defendant shall, upon completion of the analysis set forth in the preceding paragraphs, develop a plan of implementation, that is, an affirmative program, to enable and encourage the satisfaction of the needs as previously set forth. That plan shall include an analysis of the ways in which the township can act affirmatively to enable and encourage the satisfaction of the indicated needs and shall include a plan of action which the township has chosen for the purposes of implementing this program. The adopted plan shall encompass the most effective and thorough means by which municipal action can be utilized to accomplish the goals set forth above.
If for any reason the township shall find that circumstances exist which in any way interfere with or bar the implementation of the plan chosen, it shall set forth in explicit detail:
a. Each and every factor;
b. The way in which each factor interferes with or bars implementation of the plan;
c. Possible alternative plans or municipal action which temporarily or permanently, wholly or in part, eliminate the indicated factor or factors; and
d. The reason why the alternative plans have not been adopted.
To the extent possible, the aforementioned analysis, studies and plans shall be undertaken with the cooperation and participation of plaintiffs and their representatives.
The aforementioned analyses, studies, development of plans and other action shall be completed within 90 days from the date of judgment. The township shall serve copies of the analyses, studies and plans on plaintiffs' attorney and this court within 90 days. The parties shall appear before *180 this court no later than ten days, or on a date set by this court, after service of said papers for a determination of whether defendants have complied with the order of this court and whether further action is necessary.
The judgment entered in this matter as to the invalidity of the zoning ordinance shall not become effective until this court shall decide that sufficient time has elapsed to enable the municipality to enact new and proper regulations for the municipality. Morris County Land, etc. v. Parsippany-Troy Hills, 40 N.J. 539 (1963).
This court retains jurisdiction until a final order issues requiring implementation of the plan as agreed upon.