181 N.J. Super. 203 (1981)
436 A.2d 1349
ROBERT TROMBETTA, PLAINTIFF,
v.
THE MAYOR AND COMMISSIONERS OF THE CITY OF ATLANTIC CITY, A MUNICIPAL CORPORATION, DEFENDANT.
Superior Court of New Jersey, Law Division Atlantic County.
Decided July 6, 1981.
*215 Robert E. Levy for plaintiff (Levy & Robertson, attorneys).
Matthew H. Powals, City Solicitor, for defendant.
GRUCCIO, A.J.S.C.
Plaintiff Robert Trombetta rents a business location at 1826 and 1826 1/2 Atlantic Avenue in the City of Atlantic City, New Jersey. Atlantic Avenue is a main artery which traverses the city. This business location appears within the central business district of Atlantic City.
Trading as United Adult Books, plaintiff operates an adult book store and provides adult entertainment through coin-operated machines. Plaintiff currently operates ten peep shows pursuant to mercantile licenses obtained for this purpose. The subject matter of this suit involves two additional applications for mercantile licenses filed by plaintiff.
*216 On February 22, 1980 plaintiff applied for 20 additional peepshow mercantile licenses. On March 12, 1980, he submitted a revised application for (24) additional mercantile licenses instead of 20. This time plaintiff requested 12 coin-operated peepshow mercantile licenses utilizing live nude female dancers, 8 coin-operated conversational booth mercantile licenses utilizing live nude females and 4 coin-operated peepshow mercantile licenses.
On March 13, 1980, one day following plaintiff's revised application, Commissioner Roth introduced Ordinance 28 of 1980, which proscribed nudity in private business establishments within Atlantic City to which the public are invited. That ordinance contained the following two sections:
SECTION 1. Nothing contained in any other ordinances to the contrary withstanding, there shall not be permitted in any public place nor on the premises of any business enterprise within the City of Atlantic City, any dancers, entertainers, performers, or other employees whose specified anatomical areas are exposed or are less than completely and opaquely covered.
For the purpose of this Ordinance, specified anatomical areas are the following:
(a) Human genitals, pubic region.
(b) Buttock.
(c) Female breast below a point immediately above the areaola.
SECTION 2. This Ordinance shall take effect immediately upon its final passage and publication according to law.
On March 27, 1980 this ordinance was amended and unanimously adopted to provide as follows:
Section 2 of Ordinance No. 28 of 1980 shall hereafter be known as Section 4 and shall be replaced by the following new Sections 2 and 3:
SECTION 2. Any person violating any of the provisions of this Ordinance shall, upon conviction thereof before the Municipal Court Judge of the City of Atlantic City, be sentenced to pay a fine of not exceeding Five Hundred Dollars ($500.00) or by imprisonment for not more than ninety (90) days in the County Jail, or both, in the discretion of the said Municipal Court Judge.
SECTION 3. For the purposes of the above Section 2, the owner of the premises in which the violation occurs and the dancer, entertainer, performer or employee involved in the violation shall both be considered as violative of this Ordinance and subject to the above penalty.
This amended ordinance became effective on March 31, 1980 upon publication.
*217 By letter dated April 2, 1980 the city solicitor asked plaintiff to reduce the number of requested licenses from 24 to 10, since "it has been the policy of the City to limit the number of coin operated vending machines (peep shows) in premises such as yours." By letter dated April 7, 1980 the city solicitor informed plaintiff that: "As to [his] application of March 12, 1980 for the 12 automatic coin operated licenses, or live pep [sic] shows utilizing nude girls, and for 7 licenses for conversational booths with nude girls, these licenses must be denied based upon Ordinance No. 28 of 1980...."
On April 25, 1980 plaintiff, through his attorney, informed the city solicitor by letter that he did not wish to reduce his request for 24 licenses to 10 and requested that his applications be processed as expeditiously as possible. By letter dated May 5, 1980 the city solicitor wrote plaintiff's counsel to indicate that the city has a legitimate interest in the number of coin-operated peep shows to be licensed in the city; that the issuance of a mercantile license is not a ministerial duty, and that the city has a right to regulate businesses within the city and the issuance of licenses for same. He expressed his continuing desire to negotiate the number of licenses for which plaintiff applied.
On May 21, 1980 plaintiff filed a complaint in lieu of prerogative writs. Plaintiff attacks the action of the city in denying the licenses, essentially on these grounds: (1) the State of New Jersey has preempted the regulation of sexually explicit materials and their communication through N.J.S.A. 2A:115-1 and its successor statute, 2C:14-4; (2) the ordinances in question are unconstitutional in that they are a prior restraint upon First Amendment rights of plaintiff and they violate the Due Process Clause of both the United States Constitution and the New Jersey State Constitution, in that they prevent circulation, communication and distribution of constitutionally protected material; (3) the ordinances have deprived and will deprive plaintiff of his rights as guaranteed by the Privileges and Immunities Clause of the Fourteenth Amendment, the Due Process Clause of the Fifth and Fourteenth Amendments, and the Equal Protection *218 Clause of the Fourteenth Amendment; (4) the city is employing its police power overbroadly, and the ordinances are arbitrary, unreasonable, discriminatory, oppressive and unlawful.
Plaintiff demands judgment against the Mayor and the Commissioners of Atlantic City pursuant to N.J.S.A. 2A:16-50 through 2A:16-62 and N.J.S.A. 2A:16-23, declaring the enactment of the ordinances as ultra vires and unconstitutional; for preliminary and permanent injunctive relief precluding enforcement of the within ordinances; for an order requiring issuance of the licenses applied for, and for costs of suit.
A hearing was held before this court on October 3, 1980 with respect to an application for a summary judgment declaring the invalidity of Ordinance 28 of 1980 and for a requirement on the part of the city to issue requested coin-operated mercantile licenses.
As a consequence of the October 3 hearing this court ordered that the city schedule a hearing with respect to the outstanding applications made by plaintiff. Such a hearing occurred on October 20, 1980 in the Atlantic City Hall.
At the time of the hearing before this court on October 3, 1980, the city took the position that Ordinance 37 of 1977 was an applicable ordinance justifying the refusal of the city to grant the requested licenses. The city places special reliance on § 2(A)(3) of that ordinance, which provides that
Any license or permit application made pursuant to the provisions of this Ordinance or any amendment thereof for the conducting of business may be denied for good cause by the Mercantile Licensing Bureau or by the Governing Body. Good cause for the denial of a license or permit shall include, but is not limited to:
........
(3) A finding by the Mercantile Licensing Bureau or by the Governing Body that said business will not comport with the peace, health, safety, convenience, good morals, or general welfare of the public....
At the hearing conducted on October 20, 1980 the city for the first time took the position that it was justified in refusing to *219 grant the requested licenses as a consequence of a provision in the Atlantic City Municipal Land Use Ordinance that prohibits live entertainment in the central business district except in a restaurant. The city denied plaintiff's applications for a second time.
In response to the city's invocation of Ordinance 37 of 1977, plaintiff submits that the refusal to issue peepshow licenses is against the weight of the evidence adduced at the October 20 hearing and that the denial is arbitrary, unreasonable and capricious. Furthermore, plaintiff seeks a declaration of invalidity of the provisions of the Atlantic City Municipal Land Use Ordinance cited by the city as its justification.
On January 23, 1981 the parties herein reargued the summary judgment motion, following the city's denial of plaintiff's application at the October 20 hearing. Cognizant that the United States Supreme Court was considering the constitutionality of an ordinance similar to Ordinance 28 of 1980, this court deferred ruling on the within motion for summary judgment pending the announcement of the decision in Schad v. Mt. Ephraim, ___ U.S. ___, 101 S.Ct. 2176, 62 L.Ed.2d 671 (1981).
For purposes of analysis it is helpful to keep in mind that the instant case will be examined from three viewpoints, namely: judicial review and procedural limitations of its exercise; legislative power and limitations on that power, and constitutional prohibitions.

Judicial Review and Procedural Limitations on its Exercise

A. The Power and Scope of Judicial Review

Whether the denial of licenses to exhibit live nude dancing in private business establishments in Atlantic City is a legitimate subject for judicial review raises an essentially antiquarian issue. It has been axiomatic since Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), that a court can adjudicate the constitutional validity of a legislative act. But beyond this virtually unanimous agreement there is sharp divergence about *220 the proper scope of judicial review. This issue, far from being antiquarian, is perennial.
The tension which sustains this divergence is the distinct nature of the legislative and judicial functions. The legislature is a mediated form of the majority will, which may not be frustrated by judicial fiat in our constitutional democracy, save by a principled application of the Constitution. This limit itself is founded on the constitutional text, that is, the First Amendment as it is incorporated by the Due Process and Equal Protection Clauses of the Fourteenth Amendment, read in the light of history.
However, the normative content of the limit  the changing contents of the public welfare  is referable not to the constitutional text, but rather to the conventions of contemporary sociopolitical culture. Perry, "Abortion, The Public Morals, and the Police Power: The Ethical Function of Substantive Due Process," 23 U.C.L.A.L.Rev. 689, 707-709 (1976). In asking whether a municipality has properly applied the public welfare limit, decisions of municipal authorities on applications for licenses are presumed to be valid. The constitutional direction that any law concerning municipal corporations be liberally construed in their favor is applicable in determining the constitutionality of an ordinance licensing and regulating mercantile and other businesses and occupations. N.J.Const. (1947), Art. IV, § VII, par. 11; Brielle v. Ziegler, 73 N.J. Super. 352, 355-356 (Law.Div. 1962).
On appeal from a ruling before the Atlantic City Board of Commissioners, the court cannot optionally supersede either the exercise of the supervisory licensing authority entrusted to it or arbitrarily overturn its bona fide discretionary determinations. Nor does a mere difference of opinion concerning evidential persuasiveness of relevant testimony enable a court to substitute its judgment for that of the duly constituted licensing agency, although the decision was rendered by the licensing agency in performance of a so-called quasi-judicial proceeding. *221 In re Sanders, 40 N.J. Super. 477, 483 (App.Div. 1956). An administrative adjudication is subject to judicial review where it offends the State or Federal Constitution or is ultra vires of a statutory grant, unsupported by adequate evidence, or unreasonable, unjustly discriminatory, arbitrary or capricious. In re Larsen, 17 N.J. Super. 564, 570 (App.Div. 1952).
Attempts to accommodate constitutional rights with broad if not universally shared ideas of public welfare have inherently limited power, for we are talking about the rights of individuals or groups pitched against the larger community and perhaps against the overwhelming majority of a municipality as a whole. Courts must ultimately define and defend individual rights against government in terms independent of consensus or majority will, and endure, if need be, the censure of majoritarian judgment. See I Tribe, American Constitutional Law, 896 (1978).

B. Procedural Limitations on the Exercise of Judicial Review

Two judicially declared procedural limitations on judicial review merit attention here.
Standing. This court cannot pronounce any municipal ordinance void because irreconcilable with the Constitution, except as it is called upon to adjudge the rights of litigants in actual controversy. In other words, a party must have "a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." Sierra Club v. Morton, 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). Therefore, I on my own motion raise the issue whether plaintiff is in a position to demonstrate a concrete stake in the outcome of this suit and a direct impairment of his own constitutional rights. I must ask whether plaintiff has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).
*222 Standing to make a constitutional claim requires analysis in terms of two inquiries: (a) "whether [plaintiff] alleges that the challenged action has caused him injury in fact, economic or otherwise," and (b) "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 152, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) (Emphasis added). As part of the "injury in fact" requirement, plaintiff must demonstrate a personal harm that would be eliminated if plaintiff's claim were accepted. See Linda R.S. v. Richard D., 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973); Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 103 (1976).
Ordinance 28 of 1980 enumerates criminal penalties that may be imposed against both a proprietor and entertainer who feature live nude dancing. The Municipal Land Use Ordinance in question prohibits live nude dancing in the instant case because plaintiff's establishment is not a restaurant. Additionally, plaintiff endures the obvious financial loss which attends the denial of his license applications. If the licenses were granted, plaintiff's personal harm would be eliminated. Therefore, I am satisfied that plaintiff has demonstrated that he has standing in the instant case.
To have standing, plaintiff must have suffered, or may presently suffer, a direct impairment of his own constitutional rights. A plaintiff may, however, assert third-party rights where he himself has suffered injury and third parties find it difficult to assert their own rights (see NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)) or the injury suffered by plaintiff adversely affects his relationship with third parties, resulting in an indirect violation of their rights (see Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d *223 397 (1976)). Mr. Justice White has addressed the ability of a proprietor to raise the constitutional rights of his customers in the context of live nude dancing in his majority opinion in Schad, supra:
... Because appellants' claims are rooted in the First Amendment, they are entitled to rely on the impact of the ordinance on the expressive activities of others as well as their own. "Because overbroad laws, like vague ones, deter privileged activities, our cases firmly establish appellant's standing to raise an overbreadth challenge." Grayned v. City of Rockford, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972). [___ U.S. at ___, 101 S.Ct. at 2181]
Accordingly, plaintiff may assert the impairment of the constitutional rights of his dancers and customers as well as his own constitutional rights.
Ripeness. The standing question bears close affinity to questions of ripeness, that is, whether the harm asserted has matured sufficiently to warrant judicial intervention. Issues must be fully developed, clearly defined and not merely speculative, conjectural or premature.
In analyzing the instant factual complex and its attendant procedural history for ripeness, the court will consider the following elements: (1) in view of the issues presented herein, whether further delay in bringing the action would assist this court materially in understanding the issues; (2) whether the interpretation of the challenged ordinances, or the manner in which they are being applied, is ambiguous or uncertain because the facts have not yet progressed to the point that actual enforcement has taken place or the practical impact of the ordinance clarified by experience.
Further delay in bringing this action would not assist this court materially in understanding the issues. A claim that an ordinance is void on its face is generally "ripe" much earlier than a claim that the ordinance is void as applied. In Morristown v. Hanover Tp., 168 N.J. Super. 292, 300 (1979), the Appellate Division held that where the invalidity of provisions of a township ordinance restricting the use of an airport maintained by the town was apparent on the face of the ordinance, further *224 factual exploration was not essential and the town was entitled to a summary judgment in its favor on the ground that the ordinance was facially invalid as violative of the statutory immunity. Hereinafter the court shall demonstrate that Ordinance 28 of 1980 is facially invalid as violative of the First and Fourteenth Amendments. The court shall also demonstrate that the section of the Municipal Land Use Ordinance which restricts live entertainment to restaurants in the central business district is void on its face as violative of the Equal Protection Clause of the Fourteenth Amendment. Pursuant to the holding in Morristown, supra, further factual exploration regarding these two ordinances is not essential.
The city proposes that there are material factual issues outstanding which surround the Municipal Land Use Ordinance. Specifically, it refers to plaintiff's contention that the city has failed to identify specific important and substantial governmental interests to substantiate the enforcement of its zoning requirement that live entertainment be confined to restaurants in the central business district. The city submits that these issues are factual and not proper for disposition in a motion for summary judgment. The city cites T. & M. Holmes, Inc. v. Mansfield Tp., 162 N.J. Super. 497, 519 (Law Div. 1978) for the proposition that, when a zoning ordinance is attacked for having no substantial relationship to the public health, safety, morals or general welfare, such a question is factual, must await trial for determination and is not ripe for summary judgment.
Reliance on T. & M. Holmes, Inc., is misplaced. The pertinent section of the Municipal Land Use Ordinance under consideration is, among other things, subject to equal protection scrutiny. As the court shall discuss at length in a subsequent section of this opinion, equal protection analysis inverts the presumption of constitutionality, demanding that the municipality justify its classification as necessary to achieve a compelling municipal interest when a fundamental interest is present in the case. The record below reveals that the municipality failed to *225 proffer any reason to justify its classification scheme. Consequently, there are no facts in issue with regard to this classification scheme which would preclude the consideration of summary judgment.
As to Ordinance 37 of 1977, which provides for the denial of mercantile licenses on the basis of the public health, safety, welfare and good morals, this court is in the posture of a reviewing court to determine whether the governing body below articulated and supported a reasoned, significant basis for its decision. In the absence of such a finding, this court must rule that the action below was arbitrary, unreasonable and capricious. In re Sanders, supra, 40 N.J. Super. at 483. Since a hearing was held on plaintiff's application on October 20, 1980 and a transcript was provided to the court for its review, the applicability of Ordinance 37 of 1977 to the instant factual complex is ripe for determination.

Legislative Power and Limitations on that Power
The city confuses the issue of whether the municipality has the power to enact with the question of whether such allocated power has been exercised in a manner that violates constitutional limitations. Questions of municipal legislative power relate to the allocation of governmental authority. For example, does the city have power to enact a zoning ordinance controlling the use of land? Does the city have the power to make and enforce ordinances to license and regulate places of public entertainment? Questions of limitations relate to the way in which the power is exercised. For example, does a municipal zoning ordinance impose such severe controls on the use of land as to violate the Due Process Clause of the Fourteenth Amendment? Does a municipal ordinance which regulates and licenses places of public entertainment extend beyond the limitations which the police power allows? The usual question is not whether the municipal ordinance is within the permissive objects of the police power, but whether it contravenes the limits on that power.
*226 A municipal corporation is a government of enumerated powers, acting by delegated authority. It has no inherent jurisdiction to make laws or adopt regulations of government, and its power to regulate or license emanates by statute and is dependent upon and limited by the power so conferred. Gilbert v. Irvington, 20 N.J. 432, 436 (1956); N.J.S.A. 40:52-1, 2. Municipalities have the power and authority to enact ordinances in support of the police power. Hutton Park Gardens v. West Orange, 68 N.J. 543, 564 (1975). N.J.S.A. 40:52-1(f) specifically provides that a governing body may make and enforce ordinances to license and regulate places of public entertainment. Municipal regulations issued under the statute relating to the power to license, N.J.S.A. 40:52-1, 2, as well as zoning ordinances, N.J.S.A. 40:55D-62, rest upon the police power. Howell Tp. v. Sagorodny, 46 N.J. Super. 182, 192 (App.Div. 1957), aff'd 25 N.J. 502 (1958); N.J.Const. (1947), Art. IV, § VI, par. 2. Municipalities may enact ordinances under their grants of general police power even though they might also enact ordinances under the zoning power. Larson v. Spring Lake Heights, 99 N.J. Super. 365, 371-2 (Law Div. 1968). Municipal police power can be exercised only in those areas where regulation is needful for the common good, that is, public health, safety, morals or general welfare, and then only by reasonable means substantially connected with the public interest designed to be advanced. Mogelefsky v. Schoem, 90 N.J. Super. 49, 57 (Law Div. 1966), mod. on other grds. 50 N.J. 588 (1967).
Despite the fact that a municipal ordinance may be within the permissible objectives of the police power, all police power legislation, including zoning, is subject to constitutional limitations that it not be unreasonable, arbitrary or capricious, and that means selected via such legislation shall have real and substantial relation to the objects sought to be attained. Gabe Collins Realty, Inc. v. Margate City, 112 N.J. Super. 341, 346-7 (App.Div. 1970). Municipalities, like other agencies of government, must operate within a framework of constitutional government under which the judicial branch has been assigned *227 jurisdiction to adjudicate cases and controversies arising out of the exercise of governmental powers by the legislative and executive branches. Pascack Assoc. v. Washington Tp., 131 N.J. Super. 195, 202 (Law Div. 1974), mod. on other grds. 74 N.J. 470 (1977).
Plaintiff does not contest that the city in the instant case has the power to enact zoning ordinances to control the use of land. Nor does plaintiff contest that the city may enact ordinances under its grant of general police power to license and regulate places of public entertainment. However, plaintiff does posit that the within municipal legislation contravenes constitutional limitations. It is this aspect of municipal legislation that this court will explore.

Allocation of the Burden of Persuasion
One of the puzzling features of this case is that the character of the prohibition the city seeks to enforce is so difficult to ascertain. It changes color and complexion, chameleon-like, every time it becomes subject to attack. The outcome, in this court's judgment, depends on the allocation of the burden of persuasion, depending upon which ordinance the city relies on at a given time. If one starts, as plaintiff does, from the premise that his claims are rooted in the First and Fourteenth Amendments, it would seem reasonable to require the city to overcome a presumption of invalidity. The city could carry this burden by showing that its ordinances were narrowly drawn and furthered a sufficiently substantial governmental interest. See Schad, supra, ___ U.S. at ___, 101 S.Ct. at 2188 (Stevens, J., concurring).
If the case is viewed as a simple attempt by the city to confine live entertainment to restaurants within the central business district pursuant to its zoning powers, it would seem reasonable to require plaintiff to overcome the usual presumption that a municipality's zoning enactments are constitutionality valid. However,

*228 ... the presumption of validity that traditionally attends a local government's exercise of its zoning powers carries little, if any, weight where the zoning regulation trenches on rights of expression protected under the First Amendment. In order for a reviewing court to determine whether a zoning restriction that impinges on free speech is "narrowly drawn [to] further a sufficiently substantial governmental interest" [citation omitted], the zoning authority must be prepared to articulate, and support, a reasoned and significant basis for its decision. This burden is by no means insurmountable, but neither should it be viewed as de minimis. [Id. at ___, 101 S.Ct. at 2187, Blackmun, J. concurring]
In such a case any discrimination against the exercise of a constitutional right invades a fundamental interest. As mentioned before, the court inverts the presumption of constitutionality, demanding that the municipality justify its classification as necessary to achieve a compelling municipal interest. The municipality assumes the burden of persuasion to demonstrate that the same interest cannot be achieved by means that do not work such a discrimination.
Ordinance 37 of 1977 vests in the governing body of the city authority to deny mercantile license applications on the basis that the business interests in question do not comport with the general health, safety, welfare and good morals. That ordinance is enacted pursuant to the police powers of the municipality. Where the subject matter of the ordinance is within the police powers of the municipality, it must be presumed that the ordinance is reasonable, unless the contrary is shown. N.J.Const. (1947), Art. IV, § VII, par. 11; Newark v. Zemel, 17 N.J. Super. 295, 598 (Law Div. 1952).
This court must also allocate a burden of persuasion when a municipality engages in licensing activities by negotiating with the applicant as to the number of licenses to be issued on an ad hoc basis. Because all licensing systems permit some administrative discretion, all courts must demand strict procedural safeguards as a precondition for any valid prior restraint of activities linked with the First Amendment. In Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1968), the United States Supreme Court enunciated certain procedures in this regard which it had found required by the First Amendment. *229 These procedures may briefly be summarized as follows: (1) a municipality assumes the burden of proof to justify any restraint on free expression prior to its judicial review and to demonstrate the particular facts necessary to sustain a limitation on expressive behavior; (2) a licensing official regulating such expressive behavior must act upon a license application within a specified brief period of time; (3) the licensing official must either issue the license or seek judicial approval to restrain unlicensed expressive acts. Id. at 58-59, 85 S.Ct. at 738-739.

Constitutional Prohibitions
The Constitution enunciates many express, and some implied, prohibitions against designated actions by government. These prohibitions reflect the intent of the framers that all governmental powers, whether exercised by municipal, state or national governments, should be limited in order to prevent the abuse of personal freedoms and the erosion of fundamental interests. Of particular importance herein is the extent to which these constitutional prohibitions limit the exercise of municipal legislative judgment with respect to live nude entertainment.
While plaintiff seeks judicial intervention on a number of theories previously enumerated, this court rests its determination on First Amendment guarantees as applied to municipalities, by virtue of the incorporation of the First Amendment into the Fourteenth Amendment, and equal protection and procedural due process concerns as guaranteed by the Fourteenth Amendment. Therefore, this court need not consider alternative theories which have been suggested. Under the First Amendment, "Congress shall make no law ... abridging the freedom of speech...." This guarantee applies to expressive conduct and has been held applicable to the states by reason of the "liberty" protected by the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). The Fourteenth Amendment is applicable to municipal ordinances as well as to *230 state statutes. Silco Automatic Vending Co. v. Puma, 105 N.J. Super. 76, 89 (Law Div. 1969), rev'd on other grds. 108 N.J. Super. 427 (App.Div. 1970).
The instant task of defining fundamental interests and substantive rights is eased somewhat since they can be located within a specific regulatory setting. Thus, this court shall consider various points of intersection between plaintiff and the municipality. In each instance focus shall be not only on the fundamental interest or substantive right of plaintiff thought to be at stake, but also on the way in which the municipality appears to be usurping it. Such efforts will be examined, from the most blatant to the most benign, and determinations will be offered about the constitutional limits to which these efforts are subject. This court will examine municipal interference with liberty through direct suppression, regulation and deliberate omission. First will be considered perhaps the starkest form of municipal legislative invasion of a fundamental interest  Ordinance 28 of 1980  the naked attempt to suppress directly the protected expressive behavior of live nude entertainment. Secondly, without aiming at communicative impact, this court will consider how the municipality can constrict communicative impact through actions aimed at noncommunicative impact, but nonetheless having adverse effects on communicative opportunity. In the Municipal Land Use Ordinance of March 1979 the city attempts to limit such activity through zoning. By utilizing § 2(a)(3) of Ordinance 37 of 1977 the municipality attempts to restrict expression by reference to the adverse consequences of allowing such entertainment to enter the realm of awareness in opposition to general concerns of public health, safety, general welfare and morals. Through deliberate omission the municipality has exercised its extraordinary powers of prior restraint to foreclose timely expression by failing to review promptly plaintiff's requests for licenses.

A. Ordinance 28 of 1980

Plaintiff's first argument rests on the contention that Ordinance 28 of 1980 impermissibly burdens the content of communicative *231 activity, is unconstitutionally overbroad and is facially invalid, in violation of the First and Fourteenth Amendments. It is clear that the ordinance is fatally defective in these regards.
Ordinance 28 of 1980 proscribes nudity in private business establishments within Atlantic City to which the public are invited. While a municipality need not persuade a state court that its legislative decisions are correct as a matter of policy, Tillberg v. Kearny Tp., 103 N.J. Super. 324, 330 (Law Div. 1968), when First Amendment interests are implicated, a municipality must at least be able to demonstrate that a policy is applied in a content-neutral fashion, that it does not proscribe activities that constitute an exercise of protected expressive rights and that the language of its legislative judgment be valid on its face.
Ordinance 28 of 1980 is aimed directly at the content of expressive activity i.e., live nude dancing in a business establishment to which the public is invited. Any municipal action aimed at communicative impact of expressive activity is presumptively at odds with the First Amendment. For, if the constitutional guarantee means anything, it means that, ordinarily at least, a municipality "has no power to restrict expression because of its message, its ideas, its subject matter, or its content...." Police Dept. of the City of Chicago v. Mosely, 408 U.S. 92, 95-96, 92 S.Ct. 2286, 2289-90, 33 L.Ed.2d 212 (1972). A municipality abridges expressive conduct by enacting legislation which on its face singles out a particular category of expressive conduct for suppression. Because the ordinance is aimed at the communicative impact of the conduct proscribed, it will be unconstitutional unless the municipality can demonstrate that the expressive activity is otherwise unprotected by the First Amendment.
Pursuant to Schad v. Borough of Mt. Ephraim, supra, the issue before me, then, is no longer whether live nude dancing is within the protections of the First and Fourteenth Amendments. It is clear that live nude dancing is so protected.

*232 ... Nor may an entertainment program be prohibited solely because it displays the nude human figure. "Nudity alone" does not place otherwise protected material outside the mantle of the First Amendment. [Id. at ___, 101 S.Ct. at 2181; citations omitted]
While the parameters of this protection may be difficult to ascertain, Justice Stevens in his concurrence in Schad characterizes the protection as "the foliage of the First Amendment" which casts "protective shadows over some forms of nude dancing." Id. at ___, 101 S.Ct. at 2189. It is irrefutable that the exclusion of live nude dancing in Atlantic City prohibits a wide range of expression that has long been held to be within the protection of the First and Fourteenth Amendments.
Once it is determined that a municipal ordinance is aimed at the communicative impact of expressive activity, a court must invalidate the ordinance unless it falls within one of several narrow exceptions to the principle that government may not proscribe the form or content of individual expression. While obscenity is one of these exceptions, "nudity alone is not enough to make material legally obscene under the Miller standards." Jenkins v. Georgia, 418 U.S. 153, 161, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974). For the reasons articulated above, Ordinance 28 of 1980 is facially invalid and unconstitutional.
But a court should also subject to demanding scrutiny any municipal act, whether taken by a governing body or municipal official, which has the effect of controlling or penalizing the exercise of rights of expression. If the First Amendment requires an extraordinary justification of government action which is aimed at communicative activity that a municipality does not like, the constitutional guarantee should not be avoidable by municipal action which seeks to attain that unconstitutional objective under some other guise. In the instant case the city attempts to achieve that unconstitutional objective pursuant to the Municipal Land Use Ordinance of March 1979 and Ordinance 37 of 1977.
Pursuant to Ordinance 28 of 1980 the city abridged protected communicative activity by seeking to suppress it directly. *233 Of course, the target of municipal action is instantly recognized since Atlantic City acknowledges on the face of Ordinance 28 of 1980 that its purpose is suppression of live nude dancing. Nevertheless, the city defends the restriction on free expression by reference to some other powers which do not address the content of communicative activity itself  namely, by invoking the protective talisman of "health, safety, and welfare" in enforcing zoning regulations. The difference between the latter two ordinances and Ordinance 28 of 1980 is that Ordinance 28 is directed at consequences that occur when the expressive activity is communicated, while the other two ordinances are directed at the noncommunicative impact of expressive activity. The Municipal Land Use Ordinance of March 1979 and § 2(a)(3) of Ordinance 37 of 1977 are constitutional so long as they do not interfere with the free flow of communicative activity of live nude dancing. It remains for this court to consider whether these two ordinances confine themselves to constitutional parameters.

B. Municipal Land Use Ordinance of March 1979

The second ground which defendant asserts as a justification for precluding live nude entertainment is that plaintiff's business location is found within the central business district of Atlantic City, and the Municipal Land Use Ordinance of March 1979 confines live entertainment of any sort in this district to restaurants. The application of the Municipal Land Use Ordinance to justify the denial of plaintiff's licenses involves a variation on the theme of unwarranted municipal interference with a preferred personal freedom, namely, communicative behavior. The existence of a constitutionally protected right may form the basis for the enforcement, against selective municipal interference, of a constitutional norm of equality under the Equal Protection Clause. Police Dept. of the City of Chicago v. Mosely, supra 408 U.S. at 96, 92 S.Ct. at 2290.
It may appear to some observers that First Amendment or due process analysis would have sufficed to dispose of this case, *234 and that equal protection analysis is not crucial. Yet the equal protection conclusion of this court is worth noting: despite the close connection between assuring unimpeded personal choice and preventing government selectivity with respect to where a person may engage in protected communicative activity in a municipality's basic structures, mere differences in relative levels of governmental support provided to various groups need not automatically trigger the same concern. The city seems to make the dubious distinction between Ordinance 28 of 1980 as an absolute deprivation and the Municipal Land Use Ordinance as a relative deprivation. Yet this distinction overlooks the possibility that even relative deprivations may well be employed to usurp the ability of individuals to make personal choices in spheres presumptively beyond majoritarian intrusion.
Equal protection strict scrutiny addresses the absolute deprivation of protected communicative activity, visited selectively. The Equal Protection Clause is more than a vehicle for strict scrutiny of municipal action penalizing the exercise of independently-derived constitutional rights. Inequalities may trigger strict scrutiny in a second way, by impinging directly on access to those rights deemed fundamental in the sense that departures from equality in their availability are suspect. See Tribe, American Constitutional Law, 1005-1006 (1978).
On this understanding of the case, equal protection analysis stands for an extraordinarily powerful proposition:
___ Equal Protection analysis demands strict scrutiny not only of classifications that penalize rights already established as fundamental for reasons unrelated to equality, and of classifications that unequally distribute access to established rights whose very fundamentality resides in a norm of equal availability, but also of classifications unequally distributing access to choices that ought to be placed beyond government's reach  and in that sense be deemed fundamental  because, in government's hands, control over those choices would pose too great a danger of majoritarian oppression or enduring subjugation. [Id. at 1011]
In Schad, supra, Justice White specifically addressed the relationship between a zoning ordinance and activities protected under the First Amendment. In considering such a *235 relationship, a three-part model was enunciated. Municipal zoning ordinances are sustained if they are rationally related to legitimate municipal concerns and do not deprive the owner of an economically viable use of his property. But Justice White warns that such an ordinance may fail even under that limited standard of review. ___ U.S. at ___, 101 S.Ct. at 2182. Second, if a municipal zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest.
In Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), for example, the court recognized its obligation to assess the substantiality of the justification offered for a regulation that significantly impinged on freedom of speech:
"Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of First Amendment rights." 308 U.S., at 161, 60 S.Ct. at 150. [Id.]
Third, the court must not only assess the substantiality of the governmental interests asserted, but also determine whether those interests could be served by means that would be less intrusive on activity protected by the First Amendment. In expounding on this proposition, Justice White cites the following passage from Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 78 (1980): "The village may serve its legitimate interests, but it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms." [___ U.S. at ___, 101 S.Ct. at 2184, citations omitted]
The City in the instant case has failed to proffer any reasons why the confinement of live entertainment to restaurants in the central business district is rationally related to legitimate municipal concerns. Such a zoning classification infringes upon protected liberty, yet the city fails to substantiate in any fashion any justification for this regulation. Nor does the city intimate *236 that any governmental interest it may have in this regard, although none were asserted, could not be served by means that would be less intrusive on activity protected by the First Amendment.
Defendant contends that this case is controlled by Young v. American Mini Theatres, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Reliance is placed on the fact that the court there stated that a zoning ordinance is not invalid merely because it regulates activity protected under the First Amendment. The challenged restriction in American Mini Theatres was the location of adult movie theaters. The restriction did not affect the number of adult movie theaters that could operate in the city; it merely disbursed them. The Court in America Mini Theatres did not imply that a municipality could ban all adult theaters  much less all live entertainment or all live nude dancing  from its central business district. Obviously, such a case is not dispositive of the issues presented herein. As Justice Blackman noted in Schad, supra:
... After today's decision, it should be clear that where protected First Amendment interests are at stake, zoning regulations have no such "talismanic immunity from constitutional challenge." Young v. American Mini Theatres, Inc., 427 U.S. 50, 75, 96 S.Ct. 2440, 2454, 49 L.Ed.2d 310 (1976) (concurring opinion). [Id. ___ U.S. at ___, 101 S.Ct. at 2187 (Blackman, J., concurring)]
Concomitant with the presumption of the validity of ordinances is a presumption that the classifications contained therein and their relationships to other enactments are reasonable and valid. Trainor v. Newark, 145 N.J. Super. 466, 472 (App.Div. 1976), supplemented on other grds. 148 N.J. Super. 434 (App.Div. 1977). The presumption of validity of municipal ordinances has less force when a classification turns on the subject matter of expression, but it is the duty of the court to construe the ordinance so as to render it constitutional, if it is reasonably susceptible to such a construction. New Chancellor Cinema, Inc. v. Irvington, 169 N.J. Super. 564, 569-570 (Law Div. 1979). In this case, however, Atlantic City has not adequately justified its substantial restriction of protected activity. No justification *237 was articulated by the municipality that such a zoning classification is reasonable and valid. Due to the city's failure to sustain its burden of proof in this regard, this court has no alternative but to declare the provision in the Municipal Land Use Ordinance of March 1979, which provides that live entertainment be confined to restaurants in the central business district, as violative of the Equal Protection Clause.

C. Ordinance 37 of 1977

The third asserted ground for the denial of plaintiff's mercantile licenses is the applicability of § 2(a)(3) of Ordinance 37 of 1977, which provides that any license may be denied on the basis that the business in question will not comport with the peace, health, safety, convenience, good morals or general welfare of the public. Such an attempt to ground a constitutional right of communicative behavior in conventional morality or in broadly, if not universally shared, ideas of public welfare is helpful but has inherently limited power. After the Schad opinion, it should be clear that where protected First Amendment issues are at stake,
... broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone.... NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963) [Village of Schaumburg v. Citizens for a Better Environment, supra 444 U.S. at 637, 100 S.Ct. at 836, cited with approval in Schad, ___ U.S. at ___, 101 S.Ct. at 2184].
Even assuming the validity of 2(a)(3) of Ordinance 37 of 1977, the question remains whether, on the evidence below, the action of the municipality was arbitrary, capricious and unreasonable. This court holds that the denial of plaintiff's licenses was arbitrary and capricious insofar as it was based on the testimony, summarized below, at the public hearing on plaintiff's license applications on October 20, 1980. A special meeting was held in the Commission Chambers, 2nd Floor, City Hall, 1301 Bacharach Boulevard, Atlantic City, New Jersey, to consider plaintiff's outstanding applications for mercantile licenses. At the outset of the hearing Mayor Joseph Lazarow, Commissioner Joseph Pasquale, Commissioner Edmund Colanzi and *238 Commissioner Michael Matthews were in attendance. At some point during the course of the hearing Commissioner Colanzi withdrew and the balance of the hearing was conducted by the mayor and the two commissioners. The final decision was made by the mayor and the two remaining commissioners.
At the start of the hearing the city solicitor announced that Ordinance 28 of 1980 was the chief reason for the denial of the application for mercantile licenses requested by plaintiff. He announced that he was prepared to demonstrate through witnesses that the licenses should not be issued pursuant to the guidelines of Ordinance 37 of 1977 and, more specifically, pursuant to the guidelines enunciated in § 2, par. 3, of that ordinance. He continued to say that Ordinance 28 of 1980 is the ordinance upon which the mercantile licenses were denied with respect to machines that would operate and utilize nude girls.
J. Thomas Fiedler, Director of City Planning, was the first witness called by the city. Fiedler indicated that his office was involved in an investigation to determine whether plaintiff's bookstore was in compliance with the Municipal Land Use Ordinance, especially in regard to a sign to be erected on the exterior of the bookstore. Fiedler and plaintiff met in February 1980, at which time Fiedler apprised plaintiff that he could not approve a sign that plaintiff proposed to erect outside his bookstore to advertise live nude shows. The basis of this denial was the fact that the Municipal Land Use Ordinance restricted live entertainment in the central business district. Such live entertainment is restricted to restaurants in the central business district. Fiedler advised plaintiff that he could provide live entertainment in his present location only by obtaining relief from the zoning board. The objection from a zoning point of view was not whether the entertainment was nude, but only that it was live. Fiedler noted that the introduction of the proposed live entertainment would have a negative impact in upgrading the quality of the central business district in Atlantic City.
*239 On cross-examination Fiedler conceded that he had no familiarity with plaintiff's application since the incident of the sign on March 3, 1980. He sent his decision regarding the erection of the sign on plaintiff's bookstore to the city solicitor prior to March 2, 1980. Fiedler conceded that the letter sent by the city solicitor to plaintiff relied solely on Ordinance 28 of 1980 and never mentioned the Municipal Land Use Ordinance as the basis for the denial of the issuance of licenses. The city solicitor had a letter from the Planning Board solicitor, dated February 25, 1980, as well as the letter from Fiedler. Fiedler did not know of any reason for the distinction that was drawn permitting live entertainment in restaurants and not in any other locations in the central business district. Although he stated that nude dancing would affect property values, he conceded that he had made no study on land values since 1975, when plaintiff's store opened. He conceded that there had been no increase in criminal activity. Nor could he support his conclusions with any extrinsic evidence. Fiedler also noted that he was unaware of the existence of any unsanitary condition created by plaintiff, nor of any noise. Nor did he have any personal knowledge of any disturbance or any other condition which would cause or tend to create a public or private nuisance. He knew of no condition which a consequence of the operation of the bookstore and the proposed addition to the business that would affect the public health, safety or welfare of the citizens of Atlantic City.
On recross Fiedler conceded that he did not know if the present business had any negative impact. He confessed that he did not even visit the store. Fiedler stated that he had not done any research, nor was he aware of any other study which might show that there was impact by the addition of nudity to an existing bookstore. He stated his familiarity as consisting of having read an article about Boston approximately 18 months earlier and having picked up the New York City ordinance about two to three years earlier. Fiedler stated that he was unaware of any ordinance that banned live nude dancing for the entire community. Finally, he conceded that he had no special knowledge *240 or background with respect to the effect of live nude dancing.
The second witness was Mrs. Lillian Waters, a parent of a student attending Central Junior High School and a representative of the Parents' Advisory Council from that school. Mrs. Waters testified that while riding on a bus through Camden she observed peepshow stores and began to wonder what kind of individuals would frequent those places. She indicated that she did not want a bookstore of this type in the area where her daughter might be walking to school. During her direct testimony Mrs. Waters was not asked any questions relative to the content of Ordinance 37 of 1977, nor did she volunteer any such testimony. She conceded that she was involved in the formulation of a letter sent to the city solicitor for the elimination of plaintiff's business.
The third witness to testify was Dr. Jack Eisenstein, Superintendent of Schools in Atlantic City for the last 13 years. In response to a question as to the effect of the bookstore on school children, he stated that there was no direct activity he could put his finger on that has ever taken place as a result of the bookstore. He concluded that there would be a negative impact upon the school children as a consequence of the existence of the bookstore itself, the literature that it carries and the proposed expanded activity. On cross-examination he conceded that the bookstore had no direct effect upon the school children further conceded that the balance of his previous answer was totally speculative on his part. He conceded that he knew of nothing that the bookstore had done that in any way confirmed or exaggerated any danger with respect to the students. He knew of no instance where the bookstore had exercised any influence of any type on the students at his school. He conceded that he knew of no instance where the bookstore had ever been charged with the failure to supervise or tend its literature so that it could not get into the hands of the students. He was not asked any questions at all with reference to the criteria contained in Ordinance 37 on his direct examination.
*241 The fourth witness whom the city called was Michael Golden, one of the principal owners of Schultz Men's Wear on Atlantic Avenue and president of the Atlantic City Merchants' Association. Golden stated that he felt the bookstore would affect business and that nude shows would have a negative impact. He stated that nude shows would discourage investors and customers. He conceded that he knew of no loss of business since the date of the bookstore's opening in 1975. In attempting to substantiate his observation of a negative effect, he referred to Boston, which he claimed he observed in August 1980.
He conceded that he did not measure traffic in Boston and he cannot remember the name of a customer who talked of the diminution in traffic because of a bookstore. He agreed that there were no vacancies presently in the area of the bookstore. He conceded that he did not know of any vacancy that had ever been created as a consequence of the bookstore and conceded that vacancies were filled even after the bookstore opened. He conceded that there were no unsanitary or noise conditions, disturbances or creation of a public or private nuisance as a consequence of the bookstore. He also stated that he knew of no threat to the public health, safety or welfare as a result of the existence of the bookstore. No questions relative to the criteria enunciated in Ordinance 37 of 1977 were ever addressed to this witness on direct examination. The only questions addressed to him concerning the criteria of Ordinance 37 of 1977 were addressed by the cross-examiner, and all the answers were that there was no violation of such criteria.
The fifth witness called by the city was Joseph Laco, principal of the Central Junior High School. He testified that the Central Junior High School is located half-way around the block from plaintiff's bookstore. He affirmed that he had objected to the existence of the bookstore for the past five years. He stated that he had not been inside the bookstore for the past three years and said that he feared that the bookstore would draw unsavory characters. He referred to two events where unsavory characters went from the school to the bookstore. He stated his *242 opinion that the bookstore has to be eliminated to protect children. Laco stated that he did not feel that the police were sufficiently effective. He stated that he had no awareness of any complaints as to acts related to the bookstore in the last five years. He stated that the bookstore had no effect on the Indiana Avenue School. He said he was unaware of any unsanitary conditions created by the store. He did not know of any noise associated with the store, any disturbance that the store might have created or of any conditions that caused or tended to create a private or public nuisance. He stated that it was his opinion that the public health of the citizens of Atlantic City was affected by the fact that the store existed. He concluded in his cross-examination by conceding that he knew of nothing that the store did with respect to the well-being of the students and he did not know of any reasons to determine the store to be an injurious detriment to the public health or that it was responsible for injurious detriment to the safety of the citizens of Atlantic City. No questions relative to the criteria contained in Ordinance 37 of 1977 were ever addressed to Laco on his direct examination.
The final witness called by the city was Sgt. Edward C. Byard of the Atlantic City Police Department. This witness commenced his testimony by reading a statement relative to the nature of his duties as commanding officer of the Police-Community Relations Unit of the Atlantic City Police Department and relative to his impressions of adult bookstore clientele in general. He conceded that at no time was plaintiff's bookstore ever observed or that he had ever entered it. He stated that the information in his statement did not relate to this particular bookstore. Byard said that the proposed booths were such that the customer and the nude person would be separate and apart, and at no time would they be able to touch. The witness projected an increase in criminal activity and set forth that he opposed nudes anywhere. He stated that he had no objection to additional peepshows, but all of his objections were addressed to live nude entertainment. Byard conceded that he knew of no *243 complaint that had ever been lodged against the bookstore in terms of its operation (T. 154). He conceded that he had no knowledge of live nude dancing. He further stated that he knew of no unsanitary conditions, noise or disturbance of any kind created by the bookstore. He testified that he knew of no activities of the bookstore which injuriously affected the public health, safety or welfare of the citizens of Atlantic City as the bookstore presently exists.
The mayor made a motion to deny plaintiff's applications for licenses. The mayor concluded that the testimony of the policeman, the educator and the parent demonstrated that such a business use would not be in the best interests of the safety, health, welfare and, particularly, the morals of the city. Utilizing his own knowledge and experience, he analogized the instant factual complex to 42nd Street in New York City. He further indicated that the question of morality should be for local determination. He also indicated that the city has to be given some right to regulate and govern such business activities, to protect the safety and morality of children. In denying the applications the mayor made no specific reference to Ordinance 37 of 1977, nor the Municipal Land Use Ordinance of March 1979.
Commissioner Matthews voted to deny both license applications, for several reasons: The "key" factor is that neither application justifies good morals; "it makes Atlantic City have a honky-tonk town"; "I don't know that this would help real estate at this particular juncture"; "everyone says that it's not desirable. I don't feel that it's good morals to have it." Commissioner Matthews did not specifically address himself to the criteria of Ordinance 37 of 1977, nor did he mention the Municipal Land Use Ordinance of March 1979.
Commissioner Pasquale denied both applications, based upon what Eisenstein and Laco stated in reference to the proximity to the schools. He further indicated, "I'm not saying that I would be against this type of activity if it weren't in the center of *244 Atlantic City," analogizing such restricted locations for adult entertainment centers to areas in Cherry Hill and South Philadelphia. Commissioner Pasquale concluded by saying, "Maybe that's the way it should be. But I do not wish to see this in Atlantic City." He made no reference to the criteria enunciated in Ordinance 37 of 1977, nor did he refer to the Municipal Land Use Ordinance of March 1979.
Justice Brandeis, dissenting in Burns Baking Co. v. Bryan, 264 U.S. 504, 44 S.Ct. 412, 68 L.Ed. 813 (1924), from an opinion striking down legislation regulating bread weights, accepted the public welfare limit but attacked its incompetent, if not disingenuous, application.
It is not our province to weigh evidence. Put at its highest, our function is to determine in the light of all the facts which may enrich our knowledge and enlarge our understanding, whether the measure, enacted in the exercise of an unquestioned police power, and of a character inherently unobjectionable, transcends the bounds of reason. That is, whether the provision as applied is so clearly arbitrary or capricious that legislators, acting reasonably, could not have believed it to be necessary or appropriate for the public welfare. [at 534, 44 S.Ct. at 421]
Tillberg v. Kearny Tp., 103 N.J. Super. 324 (Law Div. 1968), gives further direction to a reviewing court in examining the record below. The Town of Kearny enacted a municipal ordinance which licensed and regulated billiard parlors. Assuming that ordinance to be valid, the court determined that the denial by the town council of the renewal of plaintiff's license insofar as it was based on testimony at a public hearing to the effect that plaintiff's billiard room attracted young people who created disturbances, trespassed upon adjacent property and generally had a detrimental effect upon the peace and welfare of the town  where there was no proof connecting the plaintiff with the conditions described  was arbitrary, unreasonable and capricious. Id. at 342-343. The Tillberg court cited the following language from Feder v. McCaffrey, Sup., 110 N.Y.S.2d 488 (Sup.Ct. 1952), with approval:

There is no factual showing that this petitioner is in any manner connected with or responsible for this alleged conditiony(3)27 If it is respondent's theory that poolrooms per se are responsible for the breeding of crime, they should all *245 be suppressed, but by legislative action after a proper legislative investigation. The remedy is not by the refusal by an administrative officer to renew a specific license of a poolroom of an operator who has not been shown by facts to have been guilty of any wrongdoing. [at 493, emphasis added by the Tillberg court]
In the present case, there is no proof connecting this plaintiff with the conditions described. If unsanitary conditions, noise, criminal activity, unsavory characters or traffic congestion occurred in the neighborhood, there were no facts adduced to causally relate plaintiff's conduct in the operation of a bookstore to such conditions. Without more information about this commercial enclave on Atlantic Avenue, one cannot know whether the change in plaintiff's business will introduce "cacophony into a tranquil setting or merely a new refrain in a local replica of Place Pigalle." Schad, ___ U.S. at ___, 101 S.Ct. at 2189 (Stevens, concurring). When the record below is opaque, as this record is, the city must shoulder the burden of demonstrating that Trombetta's introduction of live nude entertainment has an identifiable adverse impact on the neighborhood as a whole. However, this record affords no basis for any such presumption. The difficulty in this case is that this court is left to speculate as to the city's reasons for proceeding against Trombetta's business.
One fact that does appear with clarity from the record below is that in 1975 plaintiff was issued an amusement license that authorized him to exhibit adult motion pictures which his patrons viewed in private booths in his adult bookstore. City officials apparently regarded this business as lawful under the zoning ordinance and compatible with the immediate neighborhood until February of 1980, when plaintiff attempted to alter his exterior sign and modify his interior exhibitions. Although Atlantic City is in part a residential community, it is also a community that in 1975 deemed an adult bookstore that exhibited adult motion pictures, or "peepshows," not inconsistent with its basic character. This court simply cannot say with confidence that the addition of a live nude dancer to this commercial zone produces a dramatic change in the city's character. See *246 Schad, ___ U.S. at ___, 101 S.Ct. at 2189 (Stevens, J., concurring).
Justice White's majority opinion in Schad provides this court with further guidance in reviewing the record below.
Second, Mount Ephraim contends that it may selectively exclude commercial live entertainment from the broad range of commercial uses permitted in the Borough for reasons normally associated with zoning in commercial districts, that is, to avoid the problems that may be associated with live entertainment, such as parking, trash, police protection, and medical facilities. The Borough has presented no evidence, and it is not immediately apparent as a matter of experience, that live entertainment poses problems of this nature more significant than those associated with various permitted uses; nor does it appear that the Borough's zoning authority has arrived at a defensible conclusion that unusual problems are presented by live entertainment. Cf. Young v. American Mini Theatres, Inc., 427 U.S. at 54-55, and n. 6. [96 S.Ct. at 2444] [Footnote omitted.] We do not find it self-evident that a theater, for example, would create greater parking problems than would a restaurant. [Footnote omitted.] Even less apparent is what unique problems would be posed by exhibiting live nude dancing in connection with the sale of adult books and films, particularly since the bookstore is licensed to exhibit nude dancing on films. It may be that some forms of live entertainment would create problems that are not associated with the commercial uses presently permitted in Mount Ephraim. Yet this ordinance is not narrowly drawn to respond to what might be the distinctive problems arising from certain types of live entertainment, and it is not clear that a more selective approach would fail to address those unique problems if any there are. The Borough has not established that its interests could not be met by restrictions that are less intrusive on protected forms of expression. [at ___-___, 101 S.Ct. at 2184-87]
In the same fashion, the city has presented no evidence that the introduction of live nude entertainment would pose problems any more significant than those associated with various uses which are presently permitted. Nor has the city demonstrated that any unusual problems are presented by including the exhibition of live nude dancing with the sale of adult books and films. The city has not established that any interests it may have in the regulation of live nude entertainment can be met by restrictions that are less intrusive on protected communicative behavior.
Protection of Minors. The city also attempts to support § 2(a)(3) of Ordinance 37 of 1977 as an exercise of the city's undoubted police power to protect children. The city maintains *247 that even if it cannot prohibit live nude entertainment pursuant to Ordinance 28 of 1980, § 2(a)(3) of Ordinance 37 of 1977 is a reasonable means of protecting minors from this type of influence.
It is well settled that a state or municipality can adopt more stringent controls on communicative materials available to youths than on those available to adults. See Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 197 (1968). While minors are entitled to a significant measure of First Amendment protection, the First Amendment rights of minors are not "co-extensive with those of adults." Tinker v. Des Moines School Dist., 393 U.S. 503, 515, 89 S.Ct. 733, 741, 21 L.Ed.2d 731 (1969) (Stewart, J. concurring). "A state may permissibly determine that, at least in some precisely delineated areas, a child  like someone in a captive audience  is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." Ginsberg v. New York, 360 U.S. at 649-50, 88 S.Ct. at 1285-86.
However, only in relatively narrow and well-defined circumstances may a municipality or any government bar public dissemination of protected materials to them. See, e.g., Interstate Circuit, Inc. v. City of Dallas, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968); Rabeck v. New York, 391 U.S. 462, 88 S.Ct. 1716, 20 L.Ed.2d 741 (1968). A municipality cannot prevent the general public from having access to live nude entertainment on the ground that it would be objectionable if observed by children. In Butler v. Michigan, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957), the court noted that materials may not be kept from adults solely because of their possible or supposed harmful effect on children. The state argued that "by quarantining the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence, it is exercising its power to promote the general welfare." Id. at 383, 77 S.Ct. at 525. The unanimous court answered: "Surely, this is to burn the house to roast the pig." Id. Although *248 Butler dealt with the dissemination of general public materials found to have a potentially deleterious effect on minors, its rationale is equally compelling when applied to the general proscription against live nude entertainment which may possibly or supposedly have a harmful effect on children. Dictum in Jacobellis v. Ohio, 378 U.S. 184, 195, 84 S.Ct. 1676, 1682, 12 L.Ed.2d 793 (1964), indicates that states and localities "might well consider" effectuating their "exigent interest" in preventing the dissemination of materials deemed harmful to children through "preventing distribution of objectionable material to children, rather than ... totally prohibiting its dissemination." Atlantic City should heed this narrowing approach in enacting ordinances suppressing or regulating live nude entertainment on grounds deemed harmful to children.
Traffic Regulation. At the hearing conducted on October 20, 1980 the city, for the first time, sought to justify the invocation of § 2(a)(3) of Ordinance 37 of 1977 as a traffic regulation. It claimed that viewing plaintiff's business location distracts passing motorists, thus slowing the flow of traffic and increasing the likelihood of accidents. Nothing in the record below or in the text of Ordinance 37 of 1977 suggests that it is aimed at traffic regulation. But, even if this were the purpose of the ordinance, it nonetheless would be invalid. By singling out places which feature live nude entertainment, the legislative classification is strikingly underinclusive. There is no reason to think that a wide variety of other business uses in the block, featuring sales and other promotional devices, would be any less distracting to the passing motorist.
This court frequently has upheld underinclusive classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it. [Citation omitted.] This presumption of statutory validity, however, has less force when a classification turns on the subject matter of expression. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." [Citation omitted.] Thus, "under the Equal Protection Clause, not to mention the First Amendment itself," [citation omitted] even a traffic regulation cannot discriminate on the basis of content unless there are clear reasons for the distinctions. [Erznoznik v. City of Jacksonville, 422 U.S. 205, 215, 95 S.Ct. 2268, 2275, 45 L.Ed.2d 125 (1975); citations omitted]
*249 The city offers no justification, nor is this court aware of any, for distinguishing places which provide live nude entertainment from all other commercial establishments in a regulation designed to protect traffic. Absent such a justification, the ordinance cannot be salvaged by this rationale.
Approval of Neighbors in a Surrounding Commercial Area. During his testimony at the October 20 hearing, Golden, president of the Atlantic City Merchants' Association, indicated that it was the opinion of the membership and executive board of that Association that plaintiff's requests for mercantile licenses should be denied. One of the reasons articulated for this opinion was that live nude shows would have a discouraging effect on the retail aspect of the central business district. Specifically, this witness indicated that potential investors would be discouraged by the presence of this sort of operation. Women, in particular, would be apprehensive about being in the area where these kinds of stores exist. Consequently, this witness concluded, they will stay away from the entire business district. Golden surmised that the introduction of live nude entertainment would create an atmosphere in which people would feel uncomfortable about being in the same area with this sort of entertainment, and that they will not come to the business district.
Plaintiff argues in response that the determination of his license applications based on the contingency of obtaining the consent of a number of neighbors in a surrounding commercial area is invalid. In support of this position plaintiff relies upon Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 10 (1928). In that case Seattle had a zoning ordinance that permitted the construction of a philanthropic home for the aged poor in a particular district if the written consent of owners of two-thirds of the property within 400 feet of the proposed building could be obtained. The court held that provision of the ordinance unconstitutional, saying that
... There is no provision for review under the ordinance; their failure to give consent is final. They are not bound by any official duty, but are free to *250 withhold consent for selfish reasons or arbitrarily, and may subject the trustee to their will or caprice. [Citation omitted.] The delegation of power so attempted is repugnant to the due process clause of the 14th Amendment. at 122, 49 S.Ct. at 52 [Citations omitted].
This holding is highly apposite in the instant case. If the municipal governing body based its denial of plaintiff's applications on the opinions expressed by the membership and executive board of the Atlantic City Merchant's Association, such a determination is repugnant to the Due Process Clause of the Fourteenth Amendment and an improper delegation.

Prior Restraint
Censorship of protected communicative activity by advance screening or licensing (prior restraint), is generally disfavored. The court in Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963), has stated that "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."
Not all prior restraints are invalid, however. Obscenity is one of a few areas of the law in which prior restraint has been upheld. As articulated previously, Freedman v. Maryland, 381 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), enunciated certain Fifth and Fourteenth Amendment safeguards that the court has imposed on procedures employed in the prior restraint of allegedly obscene materials.
A pervasive problem in all these situations, however, is the vesting of discretion in the licensing official. A licensing ordinance that allows a municipal official to decide in his or her unfettered discretion whether to grant a license is invalid on its face; a licensing law that contains no standards, or vague standards, cannot constitutionally be applied to anyone. The critical concern is that the licensing official may grant or withhold licenses on the basis of his or her own preferences as to the content of the protected expression.
*251 In letters dated April 2 and April 7, 1980, the city solicitor asked plaintiff to consider ten additional mercantile licenses as opposed to the 24 originally requested. The city solicitor indicated that "We have attempted with the other establishments similar to yours, to maintain a certain level of these type licenses." By letter dated April 25, 1980 plaintiff, through his attorney, informed the city solicitor that he was unwilling to consider the reduction.
It remains for this court to consider whether such discretion, vested in a municipal official or governing body, to grant or deny municipal mercantile licenses, is in violation of the constitutional guarantees of due process and whether such a procedure also violates the requisite of reasonableness pertaining to all ordinances. In Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), the court maintained that
... a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional. "It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official  as by requiring a permit or license which may be granted or withheld in the discretion of such official  is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." [at 151, 89 S.Ct. at 938; citation omitted].
The New Jersey Supreme Court in Weiner v. Stratford, 15 N.J. 295 (1954), expressed the same conclusion when it cited with approval 9 McQuillin, Municipal Corporations, § 26.64, as follows:
"The fundamental rules that a municipal legislative body cannot * * * vest arbitrary or unrestrained power or discretion in * * * itself, and that all ordinances must set a standard or prescribe a rule to govern in all cases coming within the operation of the ordinance and not leave its application or enforcement to ungoverned discretion, caprice or whim are fully applicable to the administration and enforcement of ordinances requiring licenses or permits and imposing license or permit fees or taxes. Accordingly, an ordinance requiring a license or permit, or imposing a license fee or tax, should provide all of the terms under which the license or permit is to be issued and prescribe a uniform rule applicable to all of the class to which it is intended to apply, * * *. * * * ungoverned discretion in officials, * * *, in the enforcement of ordinances, makes possible, if not probable, abusive discrimination in violation of the *252 constitutional guaranty of due process and equal protection of the law, and also violates the requisite of reasonableness pertaining to all ordinances. The requirement of definite standards and conditions for the guidance of authorities in the execution of discretionary power in licensing sometimes is called the `ordinary business rule.'" [at 299]
Since the bartering procedure engaged in by the city in attempting to obtain a reduction of the number of licenses which plaintiff sought does not comport with these standards, such a procedure is found to be violative of the Due Process Clause of the Fourteenth Amendment.

Conclusion
Words like "live nude dancing," "communicative impact," "content-neutral," "obscenity," "lewdness" and "expressive activity" have been hurled into a social and political vortex to define some reliable limits upon a municipality's power to shape the behavior of individuals and groups who wish to partake of live adult entertainment. Ordinance 28 of 1980 attempted to do so by controlling the experiences available to them. Ordinance 37 of 1977 and the Municipal Land Use Ordinance of March 1979 attempted to do so by regulating the experiences with which their choices confront others. And this court was faced with the decision, in this municipality at this time, whether a person's choice to act or communicate in a certain fashion should be fundamentally protected against coercion by law.
Atlantic City has failed altogether to justify its broad restriction of protected expression in the instant case. This court permanently enjoins the Mayor and Commissioners of the City of Atlantic City, their agents, servants and employees from enforcing Ordinance 28 of 1980, § 2(a)(3) of Ordinance 37 of 1977 and the Municipal Land Use Ordinance of March 1979 insofar as that ordinance confines live entertainment to restaurants in the central business district. Furthermore, this court orders that the city forthwith issue the 24 mercantile licenses for which plaintiff has applied.
This decision does not intimate that a municipality may not regulate expressive activity  even protected activity  pursuant *253 to narrowly-drawn, content-neutral standards. But Atlantic City in the instant case has failed to follow these paths. Whatever might in theory be said either way, the choice between the dangers of suppressing live nude dancing and the dangers of its misuse if it is freely available is, ultimately, a choice "that the First Amendment makes for us." Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976).